

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 2 0 2009

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**RICELAND FOODS, INC.**                                      **PLAINTIFF**

VS.                          **CASE NO.** 3:09CV00008-BSM

**BAYER AG;**
**BAYER CROPSCIENCE AG;**
**BAYER BIOSCIENCE NV;**
**BAYER CROPSCIENCE LP;**         This case assigned to District Judge Miller
**BAYER CROPSCIENCE, LLC;**       and to Magistrate Judge Deere
**BAYER CROPSCIENCE HOLDING, INC.;**
**BAYER CROPSCIENCE, INC.; and**
**BAYER CORPORATION**                                        **DEFENDANTS**

## COMPLAINT OF RICELAND FOODS, INC.

Comes now Riceland Foods, Inc. ("Riceland"), and for its complaint against Bayer AG, Bayer Cropscience AG, Bayer Bioscience NV, Bayer Cropscience LP, Bayer Cropscience, LLC, Bayer Cropscience Holding, Inc., Bayer Cropscience, Inc., and Bayer Corporation, states as follows:

1.    Riceland is a farmer-owned agricultural cooperative organized under the laws of the State of Arkansas with its principal place of business in Stuttgart, Arkansas. Riceland is a citizen of Arkansas.

2.    Bayer AG is a German corporation which, through its subsidiaries and affiliates over which it exerts substantial control, engages in, among other things, the research, manufacture, testing, marketing and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here. Through its affiliates, agents and subsidiaries, Bayer AG conducts business in the United States and in the Eastern District of Arkansas and otherwise has a presence in

this district sufficient to constitute minimum contacts in order to meet due process requirements for personal jurisdiction.

3.    Bayer Cropscience AG, a wholly-owned subsidiary of Defendant Bayer AG, is a German corporation which, through its subsidiaries and affiliates over which it exerts substantial control, engages in the research, manufacture, testing, marketing, and sale of agricultural chemicals and technologies, including the genetically-modified rice seeds or rice traits at issue here. Upon information and belief, Bayer Cropscience AG is the successor, by merger, to Bayer Cropscience GmbH. As a result of that merger, Bayer Cropscience AG has succeeded to and assumed all debts, commitments, and liabilities of Bayer Cropscience GmbH. Prior to its merger into Bayer Cropscience AG, Bayer Cropscience GmbH was a wholly-owned subsidiary of Bayer AG.    Under Bayer Cropscience GmbH's direction and control, Louisiana State University tested rice containing Bayer's genetically-modified rice seed traits at issue here.  Bayer Cropscience AG currently is the registered owner in the United States of the "Liberty Link" trademark for certain agricultural products, including the genetically-modified rice seeds or rice traits at issue here.   Through its affiliates, agents and subsidiaries, Bayer Cropscience AG conducts business in the United States and in the Eastern District of Arkansas and otherwise has a presence in this district sufficient to constitute minimum contacts in order to meet due process requirements for personal jurisdiction

4.    Bayer Bioscience NV, a wholly-owned subsidiary of Bayer AG, is a Belgian corporation involved in the research, development and marketing of seeds, including the genetically-modified rice or rice traits at issue here. Founded in 1982 as a

2

spin-off of the University of Ghent, Belgium, Bayer Bioscience NV is one of the main innovation and research centers for Bayer, as defined in Paragraph 10 below. Upon information and belief, Bayer Bioscience NV physically created the Liberty Link rice events at issue here, is the assignee of at least three U.S. patents related to the genetically-modified rice seeds or rice traits at issue here, corresponded with individuals at Louisiana State University related to Liberty Link rice testing, and was the entity to which all unused rice test seed was purportedly returned. Through its various subsidiaries, agents and affiliates, Bayer Bioscience NV conducts business throughout the United States, including but not limited to the Eastern District of Arkansas.

5. Bayer Cropscience LP is a Delaware limited partnership with its principal place of business at 2 T.W. Alexander Drive, Research Triangle Park, North Carolina 27709. Bayer Cropscience LP is the successor, by name change and/or assignment, to Aventis Cropscience USA, LP, which succession occurred when Bayer AG or Bayer Cropscience AG acquired Aventis's crop science business in or about June of 2002. Bayer Cropscience LP is registered to conduct business with the Arkansas Secretary of State and regularly transacts business in the State of Arkansas. Through its affiliates, agents and subsidiaries, Bayer Cropscience LP conducts business in the United States and in the Eastern District of Arkansas and otherwise has a presence in this district sufficient to constitute minimum contacts in order to meet due process requirements for personal jurisdiction.

6. Bayer Cropscience Holding, Inc. is a corporation formed under the laws of the State of Delaware with its principal place of business at 2 T.W. Alexander Drive, Research Triangle, North Carolina 27709. Bayer Cropscience Holding, Inc. is the

3

general partner of Bayer Cropscience LP; therefore, it has oversight and control over that entity and directs its actions. Bayer Cropscience Holding, Inc. was previously named Aventis Cropscience USA Holding II Inc., whose predecessor in interest was Aventis Cropscience USA Holding, Inc. After Bayer AG or Bayer Cropscience AG purchased Aventis, the name was changed to Bayer Cropscience Holding, Inc.; however, the duties, responsibilities, assets and functions of the corporation remained the same, and – for all intents and purposes – Bayer Cropscience Holding, Inc. is merely a successor to Aventis Cropscience USA Holding II Inc. and/or Aventis Cropscience USA Holding, Inc. and has succeeded to all the duties and responsibility of these entities and all predecessor entities. Through its various subsidiaries, agents and affiliates, Bayer Cropscience Holding, Inc. conducts business throughout the United States, including but not limited to the Eastern District of Arkansas.

7. Bayer Cropscience LP's limited partners are Bayer Cropscience, LLC and Bayer Cropscience, Inc. Bayer Cropscience, LLC is a Delaware limited liability company with its principal place of business at 2 T.W. Alexander Drive, Research Triangle, North Carolina 27709. Bayer Corporation is the sole owner of Bayer Cropscience, LLC. Bayer Cropscience, Inc. is a corporation formed under the laws of the State of New York, but its principal place of business is 2 T.W. Alexander Drive, Research Triangle, North Carolina 27709. Bayer Cropscience, Inc. is the successor, by name change, to Aventis Cropscience USA, Inc. Through their various subsidiaries, agents and affiliates, Bayer Cropscience, LLC and Bayer Cropscience, Inc. conduct business throughout the United States, including but not limited to the Eastern District of Arkansas.

4

8. Bayer Corporation is an Indiana corporation with its principal place of business located at 100 Bayer Road, Pittsburgh, Pennsylvania. Upon information and belief, Bayer Corporation is the domestic holding company, either directly or indirectly, for various Bayer ventures in the United States, including but not limited to Bayer Cropscience LP. Through its various subsidiaries, agents and affiliates, Bayer Corporation conducts business throughout the United States, including but not limited to the Eastern District of Arkansas.

9. Bayer Cropscience LP, itself and through its parents, subsidiaries, agents, affiliates and predecessor entities, including all of the Bayer defendants listed herein, produces or has produced, the genetically modified rice seeds, seed traits, or rice related genetic material intended to promote glufosinate herbicide tolerance (sometimes referred to as the LibertyLink trait of LLRice) that has contaminated the United States' commercial long grain rice supply, which contamination is at issue herein.

10. At all times relevant to this action, there has existed, and presently exists, a unity of interest in ownership and common funding and management between Bayer AG, Bayer Cropscience AG, Bayer Bioscience NV, Bayer Cropscience LP, Bayer Cropscience, LLC, Bayer Cropscience Holding, Inc. , Bayer Cropscience, Inc., and Bayer Corporation. The defendants are the alter-egos of one another and, in the case of the parent corporations, exercised decision-making and control over their subsidiaries with respect to the conduct giving rise to Riceland's claims. Alternatively, they have constituted a single business enterprise. These defendants are hereinafter collectively referred to as the "Bayer defendants" unless otherwise specified.

## I. JURISDICTION AND VENUE

11.    The Bayer defendants have availed themselves of the right to do business in the State of Arkansas by selling products in this state or placing products into the stream of commerce with the knowledge and intent that those products will be sold in the State of Arkansas and consumed by its citizens and by conducting testing of genetically modified rice varieties in Arkansas or which have infiltrated the Arkansas rice crop; these contacts are sufficient to create personal jurisdiction over the Bayer defendants. Furthermore, upon information and belief, Bayer Cropscience LP, Bayer Cropscience Holding, Inc., and Bayer Corporation have consented to personal jurisdiction in the State of Arkansas by registering to do business in this state and designating an agent for service of process for actions brought in Arkansas.

12.    This Court has subject matter jurisdiction over this action pursuant to 28 USC §§ 1332 and 1367. This complaint involves claims between (i) citizens of different states; (ii) citizens of a state and citizens or subjects of foreign states; and, (iii) citizens of different states and in which citizens or subjects of foreign states are additional parties. Riceland seeks damages from the Bayer defendants jointly in an amount in excess of $75,000.00 exclusive of interest, costs and fees.

13.    The United States District Court for the Eastern District of Arkansas is the court of proper venue pursuant to 28 U.S.C. § 1391 (a)(2) and (3). A substantial part of the events and omissions giving rise to this action occurred in this district, and a substantial part of the property involved in this action is situated in the Eastern District of Arkansas. Riceland's principal place of business is in Arkansas and Riceland has its largest rice milling facility in Jonesboro, Arkansas. Upon information and belief, the

Bayer defendants operated an LLRice nursery in Alicia, Arkansas and grew LLRice 601 and LLRice 604 in this district.

## II. FACTS

14. The Bayer defendants created, produce or have produced, patented and trademarked the genetically modified rice seeds, seed traits, or rice related genetic material intended to promote glufosinate herbicide tolerance (sometimes referred to as the Liberty Link trait of LLRice) that has contaminated the United States' commercial long-grain rice supply, which contamination is at issue herein.

15. Riceland is a miller and wholesaler of long-grain rice and rice related products, and has mills and storage facilities in Arkansas and Missouri. Riceland purchases long grain rice from farmers who transport their rice to Riceland to be stored, dried, milled, and packaged for sale or sold in bulk. Because Riceland is a cooperative, a large portion of this rice is purchased from cooperative members, but Riceland also buys rice from non-member farmers.

16. On August 18, 2006, the USDA issued an advisory disclosing that the Bayer defendants had advised it of the presence of genetically modified rice in crops grown in the 2005 and 2006 crop years. The strain of genetically modified rice was identified as Liberty Link genetically modified rice developed by Bayer; specifically, the strain initially detected was LLRice 601. Later testing in 2007 by the USDA and the Arkansas Department of Agriculture resulted in announcement of the discovery that the LLRice 604 strain had also infiltrated the commercial rice supply.

17. At the time the USDA Advisory was issued, LLRice 601 and LLRice 604 had not been authorized for commercial production or human consumption in the United States.

18. After its August 18, 2006 advisory, the USDA initiated an investigation to determine how the Bayer defendants' Liberty Link traits infiltrated the U.S. commercial long-grain rice supply. On October 5, 2007, the USDA issued its "Summary Report of Liberty Link Rice Incidents" ("USDA Report") detailing the results of its investigation.

19. Prior to August 18, 2006, Riceland exported large quantities of U.S. long-grain rice to its customers in the European Union, and these exports were a significant source of revenue to Riceland. And the Bayer defendants knew or should have known of Riceland's volume of sales to the European Union and the significance of this market to Riceland. The Bayer defendants also knew of the European Union's resistance to genetically modified rice imports.

20. The Bayer defendants developed the genetically modified Liberty Link traits at issue in an effort to create a strain of genetically modified rice that could tolerate Bayer's Liberty® herbicide. During the period 1999 through 2001, the Bayer defendants or their predecessors in interest were collaborating with Aventis Cropscience, then a division of Aventis S.A., in the development of Liberty Link rice. Aventis Cropscience commissioned Louisiana State University ("LSU"), and numerous other research farms and universities to perform field testing on various strains of Liberty Link rice. That testing began as early as 1998 and upon information and belief continues presently.

21. Bayer AG acquired Aventis Cropscience in 2001. Upon information and belief, although Bayer AG expressly excluded from its acquisition any liabilities

8

associated with Aventis Cropscience's Starlink® corn (another genetically modified product that infiltrated commercial crops), there was no exclusion of any liabilities associated with Liberty Link rice. Regardless, the Bayer defendants have at all times since the acquisition been directly involved in and exercised control over the development, testing and stewardship of the Liberty Link rice strains at issue.

22.     Bayer Cropscience AG is currently the registered owner in the United States of the "Liberty Link" trademark for certain agricultural products, including the genetically-modified rice seeds or rice traits at issue here.

23.     Bayer Bioscience NV is the assignee of at least three U.S. patents related to the genetically-modified rice seeds or rice traits at issue here, corresponded with persons growing LLRice field tests in the United States, provided testing services related to LLRice experiments in the United States, and was the entity to which unused rice test seed was supposed to be returned.

24.     Bayer Cropscience LP, itself and though its parents, agents, subsidiaries, affiliates and predecessor entities, including all of the defendants listed herein, produces or has produced, the genetically modified rice seeds, seed traits, or rice related genetic material intended to promote glufosinate ammonium a/k/a Liberty® herbicide tolerance (sometimes referred to as the Liberty Link Trait or LLRice) that has contaminated the United States commercial long-grain rice supply, which contamination is at issue herein.

25.     The United States rice marketing system is commodity-based, meaning that rice grown throughout the nation is harvested, gathered, consolidated and shipped from thousands of farms upon which it is cultivated through local, regional and terminal distribution centers.

26.     The commodity-based system makes it difficult to identify the point of origin for any particular rice or kernels of rice. Thus, the Bayer defendants' general contamination of the commercial rice supply led to the contamination of some of Riceland's rice supply which rice was allegedly resold to various customers.

27.     Prior to the Bayer defendants' contamination of the U.S. commercial long grain rice supply with genetically modified rice, no long-grain GMO rice was commercially grown in the U.S. according to the USDA. Furthermore, the Bayer defendants made statements to the USDA, Riceland, and others warranting that no Liberty Link rice had been released into the commercial rice supply.

28.     Upon information and belief, laboratory and greenhouse tests of rice containing the LLRice 601 and LLRice 604 events were conducted by Bayer in Arkansas, California, Mississippi, North Carolina, Puerto Rico, and Texas. Similar tests were conducted by them in Ghent, Belgium, Lyon, France, and Monheim, Germany.

29.     Upon information and belief, the Bayer defendants conducted tests of LLRice 601 in open fields in Arkansas, Louisiana and Texas between 1999 and 2002.

30.     Under the Bayer defendants' direct supervision and control, and with their seed, LSU grew LLRice 601 in open fields adjacent to non-transgenic rice varieties as part of a field testing program devised and coordinated by Bayer to develop a line of long-grain rice containing the LLRice 601 event that Bayer planned to market to U.S. farmers. Specifically, under the Bayer defendants' control, LSU conducted multiple tests to develop LLRice 601 breeder seed, head rows, foundation seed, and to increase seed for commercial production, as well as to test for glufosinate ammonium tolerance and agronomic characteristics of the long-grain rice seed containing LLRice 601.

31.     Under the Bayer defendants' direct authority, supervision and control, and with seed provided by them, similar testing of LLRice 601 was conducted in Arkansas, Puerto Rico and Texas by numerous seed companies, research farms and universities acting as the Bayer defendants' agents. These tests were in addition to and in conjunction with LLRice 601 tests conducted by Bayer employees at Bayer defendants' facilities.

32.     Upon information and belief, the Bayer defendants also conducted tests of LLRice 604 in open fields in Arkansas, Louisiana and Texas beginning in 1999 and continuing at least through 2002.

33.     Specifically, under the Bayer defendants' direct control, supervision, and with genetically modified LLRice 604 seed provided by the Bayer defendants, numerous seed companies, research farms and universities acting as the Bayer defendants' agents conducted tests to develop LLRice 604 breeder seed, head rows, foundation seed, and to increase seed for commercial production, as well as to test for glufosinate tolerance and agronomic characteristics of the long-grain rice containing the LLRice 604 event.    These tests were in addition to and in conjunction with LLRice 604 tests conducted by Bayer defendants' employees.

34.     After acquisition, Aventis Cropscience became a part of Bayer AG's subsidiary, Bayer Cropscience Deutschland GmbH (which has been merged into Bayer Cropscience AG).    In August 2002, that entity entered into a written agreement with LSU titled, "Research Agreement between Bayer Cropscience GmbH Germany and Board of Trustees of Louisiana State University and Agricultural and Mechanical College as Represented by the Louisiana Agricultural Experiment Station, Louisiana

State University Agricultural Center." As evidenced by the 2002 Bayer-LSU Agreement, the Bayer defendants reduced to writing, retroactive to May 1, 2000, standards and protocols under which the testing of Liberty Link rice was to be conducted, including but not limited to measures and procedures to be followed to ensure that the product did not infiltrate other crops or otherwise be introduced into commercial rice production.

35.     Because LLRice 601 and LLRice 604 were regulated articles at all times between 1999 and August 18, 2006, the Bayer defendants' and their agents' shipment, planting, growth, testing, harvesting and storage of LLRice 601 and LLRice 604 were subject to USDA/APHIS regulation under the Plant Protection Act. 7 U.S.C. § 7711 et seq.

36.     As the owner of, and applicant for (either originally or as a successor of Aventis) the authority to develop and test these genetically modified rice traits, Bayer defendants bore the ultimate responsibility for their development, cultivation, testing, handling, use and containment. Bayer's duties in this regard were non-delegable.

37.     Bayer had knowledge of the nature of the U.S. grain handling system. Consequently, Bayer was aware or should have been aware of the danger of contaminating of the U.S. commercial rice supply related to the growth and testing of LLRice.     Specifically, Bayer was aware that its genetically modified rice could contaminate the entire U.S. rice crop and infiltrate the general U.S. rice supply unless strict precautionary measures were implemented and followed at all levels of development and testing of Liberty Link rice.

38.     Despite their knowledge, the Bayer defendants failed to implement appropriate preventative standards, protocols and procedures for testing Liberty Link

rice sufficient to prevent non-transgenic U.S. commercial long-grain rice from being contaminated with Liberty Link rice through cross-pollination, commingling or other mechanisms during testing by the Bayer defendants' employees and agents.

39.    The Bayer defendants also failed to implement appropriate and reasonable mechanisms and policies to monitor whether any standards or protocols were actually being adhered to by its employees and agents who were testing Liberty Link rice strains. The Bayer defendants' lack of oversight resulted in the necessary protocols being ignored by the very persons testing and growing the Bayer defendants' Liberty Link rice strains.

40.    In addition, upon information and belief, the Bayer defendants knew or should have known about numerous violations of their internal protocols and of USDA regulations by employees and third-party agents growing Liberty Link rice, including but not limited to violations of planting protocols, storage protocols, shipping protocols, labeling protocols, isolation distance protocols, and volunteer monitoring protocols by Steve Linscombe at LSU and others. However, the Bayer defendants failed to take reasonable steps to correct these deficiencies, to discipline the persons violating the Liberty Link rice protocols, or to remove Bayer's LLRice genetic material from these persons' possession. Instead, in disregard of the violations, the potential harm created by those violations and the tendencies those violations evidenced, the Bayer defendants continued to use these same employees and agents to grow and test Liberty Link rice -- despite complaints from some of the Bayer defendants' own employees and reprimands from the USDA related to that conduct.

41.    Moreover, the Bayer defendants knew or should have known that the natural and probable consequence of the violations of the protocols observed, and the course of conduct resulting in the violations by the Bayer defendants' agents and employees, would result in the contamination of commercial non-transgenic rice crops and seed stocks. However, the Bayer defendants took no action to remediate this harm to Riceland and the rest of the rice industry. Bayer did not conduct, or at least did not publish the results of, tests of commercial non-transgenic rice for Liberty Link strains; nor did it even test the non-transgenic commercial rice strains being grown or developed at the same locations where its employees and agents had committed protocol violations while growing Liberty Link rice.

42.    Upon information and belief, certain employees and management of the Bayer defendants suggested that commercial rice supplies and food products containing rice be tested for traces of Liberty Link rice strains as a reasonable precaution to detect adventitious presence. The Bayer defendants decided not to test commercial rice despite known violations of its safety protocols, or at least not to publish the results of such Liberty Link testing. This action was malicious and in reckless disregard of the harm to Riceland and others inherent in the contamination of commercial rice supplies with Liberty Link strains.

43.    Whatever standards, protocols, procedures and measures, if any, that may have been in effect, they were not followed by Bayer and its agents, as evidenced by the fact that strains of Liberty Link rice were present in the 2005 and 2006 commercial rice crop. According to the USDA Report, seven samples of 2003 Cheniere foundation rice seed were tested; those samples were all derived or originated from

LSU. Specifically, Dr. Steve Linscombe of LSU developed that variety while also testing LLRice for the Bayer defendants. All seven samples of Cheniere tested positive for the presence of the strain LLRice 601. The report further states: "Lineage was confirmed between the 2003 Cheniere foundation seed and both 2005 Cheniere certified seed lots and 2006 commodity seed that originally tested positive for 35SBar (a DNA marker found in LLRice 601)".

44.     Additionally, the USDA Report states that the LLRice 604 strain of Liberty Link rice was found in Clearfield 131 ("CL131") rice seed. The Report was inconclusive regarding where the infiltration of LLRice 604 occurred, although LLRice 604 had been grown at LSU where the CL131 head row seed was grown.

45.     Upon information and belief, the Bayer defendants conducted multiple tests of supposedly non-transgenic commercial rice material between 2002 and May 2006, some of which tested positive for their Liberty Link strains and/or the 35SBar marker used by them in creating their Liberty Link rice strains.    Thus, the Bayer defendants knew or should have known that Liberty Link strains had infiltrated and contaminated the U.S. commercial long-grain rice supply well before being asked to confirm this by third-parties and the USDA.  Furthermore, the Bayer defendants knew or should have known then that one of the strains that had infiltrated the commercial seed varieties was LLRice 601.

46.     Despite knowledge of this contamination, the Bayer defendants made statements to Riceland, the USA Rice Federation, the USDA and others that no Liberty Link rice was being commercially grown and that the Bayer defendants had protocols in place to ensure that the commercial long-grain rice supply was not contaminated by

Bayer's Liberty Link traits. Based on the Bayer defendants' prior testing, and/or failure to conduct additional appropriate testing before making such statements, the Bayer defendants knew or should have known that this statement was false.

47. The Bayer defendants intended their statements and actions to conceal the presence of Liberty Link rice strains in the commercial long-grain rice supply. Riceland reasonably relied on those statements. The Bayer defendants' fraudulent statements proximately caused damage to Riceland.

48. Upon information and belief, Jacko Garrett retained large quantities of LLRice 601 seed in his cold storage facility in Texas at the direction of the Bayer defendants even though the Bayer defendants had asserted that they had discontinued testing LL601 in 2001 and had abandoned LL601 as a potential commercial Liberty Link seed variety. The Bayer defendants' employees told Jacko Garrett to destroy the LL601 seed in 2006 after Bayer obtained positive tests on a commercial rice variety for the Liberty Link trait, which samples ultimately tested positive for LL601.

49. The Bayer defendants' actions proximately caused the contamination of the U.S. commercial long-grain rice seed supply with their LLRice 601 and LLRice 604 Liberty Link traits. Seed dealers then sold this contaminated seed; farmers bought, grew, and harvested it; and Riceland unknowingly purchased and milled rice containing the Liberty Link traits, causing damage to Riceland.

50. After the USDA Advisory issued in August 2006, the impact on Riceland's business was substantial. Demand for Riceland rice from European customers evaporated and Riceland's good will and brand reputation in the U.S. and abroad were injured, causing significant damage to Riceland. Lawsuits were instituted against

16

Riceland by European customers, alleging that Riceland had sold them rice contaminated with the LL601 trait. Additionally, Riceland has been required to conduct costly genetic testing on its rice due to the Bayer defendants' actions.

## III. RICELAND'S CLAIMS AGAINST THE BAYER DEFENDANTS

### Count 1 – Negligence

51. Riceland incorporates by reference paragraphs 1-50 above.

52. The Bayer defendants knew or should have known U.S. law and regulations related to the production and testing of regulated genetically modified articles.

53. The Bayer defendants also knew, or are charged with knowledge of, customary practices in the rice industry of commingling rice for milling, shipment and sale.

54. Thus Bayer was, or reasonably should have been, aware that absent the implementation of strict preventive standards, protocols, procedures, and oversight of the field testing process, there was a substantial risk that genetically modified rice could infiltrate commercial rice crops, and it was reasonably foreseeable that the harm suffered by Riceland could occur.

55. Accordingly, the Bayer defendants had a duty to ensure that their Liberty Link traits, including but not limited to LLRice 601 and LLRice 604, did not infiltrate and contaminate the commercial long-grain rice supply, and did not infiltrate and contaminate Riceland's rice supply.

56. That non-delegable duty also arose as a factor of the USDA/APHIS and EPA permits issued to the Bayer defendants' and their predecessors granting limited authority to test long-grain rice containing Bayer's regulated Liberty Link traits and the corresponding duties and responsibilities placed on Bayer by federal and state regulations.

57. Furthermore, the Bayer defendants had a federal law duty to immediately disclose and report contamination of long-grain rice supplies with their LLRice 601 and LLRice 604 traits, if and when such contamination was detected by them, because those events were regulated articles as defined by the Plant Protection Act. The Bayer defendants also had a common law duty to disclose any such contamination.

58. The Bayer defendants breached their duty to institute, oversee and comply with reasonable and responsible policies, preventative standards, and practices to ensure that Liberty Link strains did not infiltrate the commercial rice crop, or to ensure that its third-party agents to whom Bayer provided LLRice genetic material complied with said practices when developing, testing, growing, handling, storing, and disposing of LLRice 601 and LLRice 604.

59. The Bayer defendants' failure to take reasonable and appropriate measures to prevent infiltration of Liberty Link rice into the commercial rice crop constitutes negligence. But for those negligent actions, the contamination of the U.S. commercial rice crop with LLRice 601 and LLRice 604 would not have occurred.

60. The Bayer defendants also violated the Plant Protection Act (7 USC § 7711 et seq.) and the Arkansas Rice Certification Act (Ark. Code Ann. § 2-15-201 et seq.) by failing to immediately report the infiltration of the regulated LLRice 601 Liberty

18

Link strain into the U.S. and Arkansas commercial rice supply as soon as they became aware of that release. Upon information and belief, the Bayer defendants knew or should have known about LL601 infiltration as early as February 2006 due to LL601 rice forwarded to them by Dr. Timothy Croughan, which Bayer did test or reasonably should have tested for LL601. The violation of these statutes is direct evidence of negligence.

61. As a direct and proximate result of the Bayer defendants' negligence, Riceland's rice supply (rice bought, milled, and stored by Riceland) became contaminated with rice containing Bayer's Liberty Link traits, including LLRice 601 and LLRice 604.

62. As a direct and proximate result of the Bayer defendants' negligence, Riceland has suffered damages in excess of 75,000.00 for which the Bayer defendants are jointly liable.

### Count 2 – *Res Ipsa Loquitur*

63. Riceland incorporates by reference paragraphs 14-62 above.

64. The Bayer defendants designed, created and were at all times in sole and exclusive control of LLRice 601 and LLRice 604 genetic material and who received, planted, tested or grew rice containing that material.

65. The Bayer defendants had both federal and state statutory and common law duties to prevent the infiltration and contamination of the U.S. commercial long-grain rice supply with its regulated Liberty Link rice.

66. In the normal course of events, no infiltration of the U.S. commercial long-grain rice crop with Bayer's LLRice 601 and LLRice 604 Liberty Link traits would have

occurred if the Bayer defendants had exercised ordinary care in developing, growing, testing and storing rice seed or rice plants containing those traits.

67.     The damage that Riceland has sustained would not have occurred except for the release of the Bayer defendants' LLRice 601 and LLRice 604 rice strains into the U.S. commercial rice supply.

68.     Riceland has been damaged in an amount in excess of $75,000.00 as a result of the aforementioned circumstances that would not have occurred but for the Bayer defendants' negligence.

## Count 3 – Negligent Entrustment

69.     The Bayer defendants created the LLRice 601 and LLRice 604 events and were in exclusive control of that material. The Bayer defendants had sole discretion over the persons to whom they provided LLRice 601 and LLRice 604 genetic material for laboratory and field testing.

70.     Upon information and belief, the Bayer defendants provided Liberty Link rice genetic material to Dr. Steve Linscombe at LSU and others, who acted as the agents of the Bayer defendants and used that material to perform various tests for Bayer. The Bayer defendants exercised dominion and control over those agents, including dictating test design, scope and timing, storage, containment and reporting protocols.

71.     The Bayer defendants also reserved the ownership of all materials provided for and any genetic materials that resulted from its agents' tests of Liberty Link rice. The Bayer defendants further had the right to terminate the tests of its agents and require the return of its Liberty Link rice-related genetic materials.

72.     Upon information and belief, after the Bayer defendants entrusted their LLRice 601 and LLRice604 related genetic material to Steven Linscombe at LSU and others, those agents violated USDA regulations governing the use, shipment, storage, planting, growth and disposal of Bayer's regulated LLRice 601 and LLRice 604 material and other regulated rice events. These violations evidence negligent conduct on the part of the Bayer defendants' agents in disregard of the foreseeable harm to Riceland and others in the rice industry.

73.     The Bayer defendants knew or had reason to know of their agents' proclivities for violating regulations and protocols related to the growth of Liberty Link rice. Indeed, numerous Bayer documents reference the known violations of said agents and the refusal of said agents to comply with USDA or Bayer protocols and procedures required to track, monitor and contain Liberty Link rice.

74.     Despite its knowledge of those violations and the proclivity of the Bayer defendants' aforementioned agents towards non-compliance, the Bayer defendants continued to entrust genetically modified Liberty Link rice varieties and related genetic material – including LLRice 601 and LLRice 604 – to such agents, and took no action to discipline these agents, correct violations, or remove entirely the Liberty Link rice material, despite having the absolute authority to do so.

75.     The Bayer defendants' entrustment to said agents and employees, despite known violations of regulations and protocols, created a foreseeable risk of harm to Riceland and others that Bayer's LLRice 601 and LLRice 604 material could escape confinement and contaminate commercial rice stocks.

76.     The Bayer defendants had a duty to use reasonable care in choosing the persons it entrusted its Liberty Link genetic material to and a duty to ensure those persons followed USDA and Bayer protocols, policies and procedures designed to ensure that material did not escape and contaminate the U.S. commercial rice supply.

77.     The Bayer defendants breached that duty by entrusting their Liberty Link material – including LLRice 601 and 604 – to persons Bayer knew had a proclivity to violate USDA regulations and/or Bayer protocols and procedures, or by unreasonably failing to remove Bayer's Liberty Link material after becoming aware of such violations or proclivities to violate protocols. These actions were unreasonable and in conscious disregard of the potential harm to Riceland and others in the rice industry.

78.     The Bayer defendants' negligent entrustment proximately caused the contamination of the U.S. long-grain rice supply with LLRice 601 and LLRice 604, which has damaged Riceland in an amount in excess of $75,000.00. Riceland's damages would not have occurred absent the Bayer defendants' negligence.

### Count 4 – Fraud and Constructive Fraud

79.     Riceland incorporates by reference its paragraphs 14-78 above.

80.     The Bayer defendants conducted multiple tests with positive results for Liberty Link contamination of supposedly non-transgenic commercial rice supplies between 2002 and May 2006. The commercial rice varieties Bayer tested in March 2006, which were received from Dr. Timothy Croughan, contained LLRice 601. The Bayer defendants also had knowledge of multiple violations of the USDA and Bayer standards, protocols and procedures related to growing, testing, storage, harvesting and shipment of its Liberty Link rice by employees and agents who had tested LLRice 601.

22

The Bayer defendants consequently knew or reasonably should have known by March 2006 that the U.S. commercial long-grain rice supply was contaminated with the regulated LLRice 601 Liberty Link trait.

81.    In spite of this knowledge, the Bayer defendants repeatedly made knowingly false representations to Riceland, the USA Rice Federation, the Northern European Rice Miller's Association, the USDA, and various rice trade groups th at Liberty Link rice was not being commercially grown in the U.S., that Bayer had taken appropriate and effective steps to prevent infiltration or adventitious presence of Liberty Link strains in commercial rice supplies, and that no accidental release of Liberty Link events had occurred.

82.    Alternatively, the Bayer defendants lacked a sufficient basis to make statements that no Liberty Link rice had infiltrated and contaminated the U.S. commercial rice supply, specifically the 2005 and 2006 crop, given their knowledge of prior positive tests for Liberty Link contamination of supposedly non-transgenic commercial rice samples, and their knowledge of the multiple violations of protocols designed to prevent such infiltration by persons who had or were field testing LLRice 601, and the fact that – despite urging from their employees and management to do so – the Bayer defendants delayed the implementation of a testing regime to test commercial rice products for the presence of Liberty Link strains.

83.    The Bayer defendants intended their misrepresentations to conceal the fact that Liberty Link rice strains had infiltrated the U.S. commercial rice supply.

84.    Riceland justifiably relied on the Bayer defendants' misrepresentations that no escape of Liberty Link rice strains or infiltration and contamination of the U.S.

rice crop with genetically modified Liberty Link rice strains had occurred. The Bayer defendants were in sole control of the LLRice 601 and 604 genetic materials; they had supervised the testing of those materials; and they had the ability to specifically test for those Liberty Link rice events in the commercial rice supply.

85.     The Bayer defendants' misrepresentations have caused damage to Riceland in an amount in excess of $75,000.00.

## Count 5 – Fraudulent Concealment

86.     Riceland incorporates by reference its allegations from paragraphs 14-85.

87.     The Bayer defendants fraudulently concealed their knowledge of the presence of LLRice 601 in the U.S. commercial rice supply and seed stocks. They knew about the infiltration of Liberty Link rice strains into the commercial rice supply yet they remained silent about that release, and even made false statements that no such release had occurred and that no Liberty Link strains were in rice being commercially grown.

88.     The Bayer defendants had a duty to disclose their knowledge that LLRice 601 had infiltrated and contaminated the U.S. rice crop. They had a duty to disclose this information pursuant to the Arkansas Rice Certification Act, the Plant Protection Act and the USDA/APHIS regulations promulgated to enforce that Act, and their USDA/APHIS permits.

89.     The Bayer defendants also had a duty to disclose because they had made affirmative statements to Riceland, the USA Rice federation, and various rice industry groups that no such contamination had occurred; accordingly, they had a common law duty to correct these misrepresentations. The Bayer defendants knew or should have

known that Riceland and others were relying on their misrepresentations, but the Bayer defendants said nothing.

90.     Instead of taking appropriate steps to notify Riceland, the rice industry or the USDA of the illegal and improper presence of LLRice 601 and LLRice 604 strains, the Bayer defendants took affirmative steps to conceal this release.

91.     The Bayer defendants' fraudulent concealment has proximately caused damage to Riceland in an amount in excess of $75,000.00.

## Count 6 – Deceptive Trade Practices

92.     Riceland incorporates by reference paragraphs 14-91.

93.     The Bayer defendants had knowledge that their employees and agents had committed multiple violations of USDA and Bayer protocols. Also, the Bayer defendants had knowledge of positive tests for Liberty Link rice strains in supposedly non-transgenic commercial rice varieties between 2002 and May 2006.

94.     Despite their knowledge of the falsity of their statements, or information that should have put them on notice that those statements were incorrect, the Bayer defendants misrepresented to Riceland and others in the rice industry that no breach of protocols had occurred, that no genetically modified Liberty Link rice strains had been released into the commercial rice crop or seed supply, and/or that no Liberty Link rice strains were being commercially grown in the United States.

95.     The Bayer defendants made these misrepresentations in the course of their business, commerce or trade in an attempt to gain economic benefits for themselves. Specifically, they made these statements to induce Riceland and the rice industry not to lobby for stricter guidelines or a moratorium on field testing of Liberty

25

Link rice strains, and to try to induce Riceland and others in the U.S. rice industry to approve Liberty Link rice's commercial growth and accept and mill that rice.

96.    The Bayer defendants' misrepresentations to Riceland and others in the rice industry about, and concealment of, their knowledge of the multiple violations of their field testing protocols and their positive tests for Liberty Link rice strains in supposedly non-transgenic commercial rice constitute a false, deceptive and unconscionable trade practice.

97.    The Bayer defendants' false, deceptive and unconscionable conduct has proximately caused damage to Riceland in excess of $75,000.00.

98.    In addition to compensatory and punitive damages, Riceland is entitled to a reasonable award of attorney's fees pursuant to Ark. Code Ann. § 4-88-113(f).

### Count 7 – Civil Conspiracy

99.    Riceland incorporates by reference paragraphs 14-98.

100.    The Bayer defendants engaged in a civil conspiracy (which included third-parties as asserted herein) to prevent the discovery that their Liberty Link rice strains had infiltrated and contaminated the U.S. commercial long-grain rice crop, including a scheme of misrepresentations to Riceland and others in the rice industry and illegal suppression of information they had a duty to disclose.

101.    The Bayer entities each engaged in a concerted effort to suppress and conceal violations of the USDA's and their own protocols, practices and procedures for growing, testing, storing, shipping and destroying Liberty Link rice, to conceal the knowledge that these protocols were insufficient to prevent the release of Liberty Link

rice in the commercial rice crop, and to conceal positive tests for Liberty Link rice – including regulated events – in supposedly non-transgenic commercial rice varieties.

102. The Bayer defendants engaged in this conspiracy with malice and in reckless disregard of the damage they knew it would cause Riceland and others in the rice industry because it was economically beneficial to the Bayer defendants to do so.

103. The Bayer defendants' conspiracy has proximately caused damage to Riceland in excess of $75,000.00.

## Count 8 – Trespass to Chattels

104. Riceland incorporates by reference paragraphs 14-103.

105. The Bayer defendants' testing of Liberty Link rice strains, and the resultant contamination of the U.S. commercial rice crop caused by their faulty procedures and intentional acts, has interfered with Riceland's right to possession and sale of its long-grain rice supply. Specifically, certain shipments of Riceland rice were permanently or temporarily impounded by European Union, Canadian, Mexican and other governmental authorities for testing and analysis due to the Bayer defendants' contamination of the U.S. long-grain rice supply.

106. The Bayer defendants' intentional action of testing Liberty Link rice strains in the U.S. in areas near non-transgenic rice, their intentional and knowing violations of the protocols for those tests, and intentional fraudulent concealment of knowledge about the infiltration of commercial rice by Bayer's Liberty Link strains, brought about the aforementioned interference with Riceland's possession, enjoyment, and sale of its rice.

107. As a direct and proximate consequence of the Bayer defendants' actions, Riceland was unable to deliver or sell, unable to deliver or sell in a timely manner, or

27

had to recall, cover or pay dockage on certain shipments of rice, which resulted in significant damages to Riceland in excess of $75,000.00.

## Count 9 – Trespass to Land

108. Riceland incorporates by reference paragraphs 14-107.

109. The Bayer defendants knew about violations of their Liberty Link testing protocols and procedures and about positive tests for Liberty Link strains between 2002 and May 2006. However, the Bayer defendants concealed and suppressed this information, while representing to the rice industry and Riceland that no such release of Liberty Link rice strains into the commercial rice supplies had occurred.

110. Given their knowledge of the presence of Liberty Link rice strains in commercial rice varieties, and their lack of action to prevent its spread, the Bayer defendants clearly intended that the escape of Liberty Link strains remain hidden and be treated like any other non-transgenic rice, including being sold to and transported to rice milling facilities such as Riceland's facilities in Arkansas.

111. Due to the Bayer defendants' actions, genetically modified rice containing their Liberty Link rice strains did make its way onto Riceland's real property, including its storage facilities and mills.

112. This contamination of Riceland's real property and the facilities built thereon by the Bayer defendants' genetically modified Liberty Link rice strains constitutes a trespass under Arkansas law. That trespass was continuing in nature.

113. Because of the Bayer defendants' trespass, Riceland has been unable to deliver or sell, unable to deliver or sell in a timely manner, had to recall, cover, re-mill or pay dockage fees on certain shipments of rice, has had to institute expensive genetic

28

testing, and/or has had to take certain steps to remediate the genetically modified rice contamination of its facilities.

114.   Riceland has been damaged as a direct and proximate consequence of the Bayer defendants' trespass in excess of $75,000.00.

## Count 10 – Conversion

115.   Riceland incorporates by reference paragraphs 14-114.

116.   The Bayer defendants repeatedly concealed and suppressed information they knew about the release of Liberty Link rice strains into the commercial rice supply, while representing to the rice industry and Riceland that no such release of Liberty Link rice strains into the commercial rice supply had occurred.

117.   The Bayer defendants took these actions because they intended the Liberty Link strains to remain hidden in the rice supply and be treated like any other non-transgenic rice, including being sold to and transported to rice milling facilities such as Riceland's facilities in Arkansas.

118.   Due to the Bayer defendants' actions, multiple shipments of Riceland rice were impounded for testing by European Union and member authorities.   Also, shipments of Riceland rice were rejected by Riceland's European Union customers while these shipments were on vessels in transit to the European Union for delivery.

119.   If the Bayer defendants had not improperly released their LLRice 601 and LLRice 604 traits into the U.S. long-grain rice supply, the aforementioned shipments would not have been impounded and in some circumstances rejected by customers in transit.

120. The Bayer defendants' conduct significantly impacted Riceland's right to possession and use of the aforementioned rice shipments and constituted an improper exercise of dominion and control over said rice.

121. The Bayer defendants' actions constitute a conversion under Arkansas law.

122. Riceland incurred dockage, impoundment, return freight and other costs related to the shipments impounded and rejected in transit as a natural and probable consequence of the Bayer defendants' actions.

123. Riceland has been damaged as a direct and proximate consequence of the Bayer defendants' actions in excess of $75,000.00.

### Count 11 -- Private Nuisance

124. Riceland incorporates by reference paragraphs 14-123.

125. The Bayer defendants have created a private nuisance due to the release into and infiltration of the commercial rice crop in 2005 and 2006 with their Liberty Link rice strains, which nuisance is a direct result of their failure to adhere to proper protocols and procedures in development, growing, testing, storage and destruction of LLRice 601 and 604, failure to ensure third-party agents of the Bayer defendants adhered to those protocols and procedures, and the fraudulent representations about and concealment of their discovery of the Liberty Link strains release into the commercial rice supply.

126. The Bayer defendants' actions and conduct, and the resulting contamination caused by their actions, constitute a substantial and unreasonable

interference with Riceland's and other similarly situated rice millers' use and enjoyment of their land and rice inventories.

127.    Riceland has suffered injuries that are distinct from the general public. Riceland has had to institute expensive testing procedures to check for the contamination the Bayer defendants cause d; Riceland has lost sales and incurred expenses due to delay, impoundment, testing and other administrative requirements instituted by foreign governments and customers; and Riceland has suffered injury to its rice brands and good will. None of these injuries and expenses would have been incurred by Riceland absent the nuisance contamination of the U.S. commercial long-grain rice supply caused by the Bayer defendants.

128.    The nuisance created by the Bayer defendants has proximately caused damages to Riceland in excess of $75,000.00.

## Count 12 – Damages

129.    Riceland incorporates by reference paragraphs 14-128.

130.    The acts and omissions described above which caused the contamination of the U.S. commercial supply in 2005 and 2006 have caused Riceland substantial damages, including but not limited to:

>    (a)    Increased costs and expenses associated with testing and monitoring rice;

>    (b)    Costs and expenses associated with storing, recalling, returning, repackaging, reprocessing or destroying rice destined for customers or other customers who post August 18, 2006, refused

to take rice not accompanied by a certificate of analysis stating that the rice was 100% non-transgenic;

(c)     Lost revenues on sales of long-grain rice and rice products, and/or cost of cover associated with acquiring rice from alternative sources;

(d)     Increased cost of production and caused loss of efficiency in Riceland's processes;

(e)     Damages to Riceland's good will, business reputation and brand names;

(f)     Costs associated with remediation of Riceland's facilities to remove Liberty Link contamination;

(g)     Costs, expenses and legal fees associated with communicating with customers and responding to and defending claims by those customers;

(h)     Costs, expenses and legal fees related to responding to and . defending claims by rice producers which would not have occurred but for Bayer's contamination;

(i)     Riceland's costs, expenses and attorney's fees associated with this Complaint.

131.   Riceland seeks compensatory damages, including consequential damages, in an amount in excess of $75,000.00 related to the actions and omissions of the Bayer defendants and for the aforementioned elements of damage, and others, as determined by the trier of fact.

132. In addition to the compensatory damages sought, Riceland seeks an award of punitive damages in an amount to be assessed by the trier of fact sufficient to punish the Bayer defendants for the aforementioned acts, omissions and conduct, and to deter similar future conduct. Riceland is entitled to punitive damages because the Bayer defendants knew or ought to have known that their violation of protocols for testing genetically modified Liberty Link rice and their suppression and misrepresentation about the escape of strains of Liberty Link rice would naturally and probably result in damage to Riceland; however, they continued such conduct in reckless disregard of the consequences to Riceland because it was economically advantageous to the Bayer defendants, from which conduct malice is inferred.

133. Riceland requests a trial by jury on its Complaint against the Bayer defendants.

WHEREFORE, Riceland Foods, Inc. requests that this Court enter a judgment in favor of Riceland and against Bayer Cropscience LP, Bayer AG, Bayer Cropscience AG, Bayer Bioscience NV, Bayer Cropscience Holding, Inc., Bayer Cropscience, Inc., Bayer Cropscience, LLC, and Bayer Corporation, jointly and severally, for compensatory and punitive damages in a sum to be determined by the trier of fact, for its costs, pre-judgment and post-judgment interest, attorneys' fees, and all other just and proper relief.

Respectfully submitted,

John R. Musgrave
David Jinkins
Christopher M. Hohn
THOMPSON COBURN LLP
One US Bank Plaza
St. Louis, Missouri 63101
Telephone: (314) 552-6000

and

Barry Deacon (75030)
Andrew H. Dallas (2003161)
Jason M. Milne (2005239)
BARRETT & DEACON
A Professional Association
Post Office Box 1700
Jonesboro, Arkansas 72403
Telephone: (870) 931-1700

By: _____
        Attorneys for Riceland Foods, Inc.